## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FERNANDO ANTONIO COLON, SR.,   )
                              )
           Plaintiff,       )
                              )
      v.                  )      Civil Action No. 23-36-GBW-CJB
                              )
KILOLO KIJAKAZI,           )
Acting Commissioner of Social Security,  )
                              )
          Defendant.     )
                              )

## <u>REPORT & RECOMMENDATION</u>

Fernando Antonio Colon, Sr., ("Plaintiff"), appeals from a decision of Defendant Kilolo Kijakazi, then the Acting Commissioner of Social Security ("the Commissioner" or "Defendant"), denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act. Presently pending before the Court are cross-motions for summary judgment filed by Plaintiff and the Commissioner (the "motions"). (D.I. 16; D.I. 21) Plaintiff asks the Court to reverse the Commissioner's decision and remand this case for either payment of benefits or for further development and analysis. (D.I. 17 at 10) The Commissioner opposes that request and asks that the Court affirm his decision. (D.I. 22 at 14) For the reasons set forth below, the Court recommends that the District Court DENY Plaintiff's motion for summary judgment and GRANT Defendant's motion for summary judgment.

## I.  BACKGROUND

### A.  Procedural Background

On August 18, 2019, Plaintiff filed a claim for DIB; he alleged disability beginning on March 11, 2018. (D.I. 8 (hereinafter "Tr.") at 21, 166-70) Plaintiff's claim was denied initially and then again upon reconsideration. (*Id.* at 92-102) Plaintiff next filed a request for an

administrative hearing. (*Id.* at 103-04) On May 4, 2021, a hearing was held before an Administrative Law Judge ("ALJ"), at which Plaintiff was not represented by counsel. (*Id.* at 40-65) A supplemental hearing before the ALJ was later held on October 5, 2021 at Plaintiff's request. (*Id.* at 66-77) Plaintiff was not represented by counsel at the supplemental hearing. (*Id.* at 70-71)

On January 19, 2022, the ALJ issued a decision denying Plaintiff's request for benefits. (*Id.* at 21-28) Plaintiff sought review of the ALJ's decision by the Appeals Council, and the Appeals Council ultimately denied Plaintiff's appeal on November 14, 2022. (*Id.* at 1-4) Thus, the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955 & 404.981; *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

On January 13, 2023, Plaintiff filed a Complaint in this Court seeking judicial review of the ALJ's decision under 42 U.S.C. § 405(g). (D.I. 3) The case was dismissed without prejudice in March 2023 due to Plaintiff's failure to pay a filing fee. (D.I. 9) This matter was then re-opened in April 2023, at Plaintiff's request, after the fee was paid. (D.I. 11)

On May 22, 2023, Plaintiff filed his motion for summary judgment. (D.I. 16) The Commissioner opposed Plaintiff's motion and filed a cross-motion for summary judgment on August 28, 2023. (D.I. 21) Briefing was completed on September 8, 2023. (D.I. 23)[1]

**B.    Factual Background**

---

[1]    On April 11, 2023, United States District Judge Gregory B. Williams referred this case to the Court to hear and resolve all pretrial matters, up to and including the resolution of case dispositive motions. (D.I. 12)

At the time of the alleged onset of his disability on March 11, 2018, Plaintiff was 54 years old.  (Tr. at 27)  Plaintiff has his GED and has past work experience as a loss prevention officer in retail stores.  (*Id*. at 50-51)

Below the Court provides a summary of some of the relevant background facts relating to Plaintiff's medical history, his hearings before the ALJ, and additional post-hearing evidence and events.  Other relevant facts will be included in Section III.

### 1.    Plaintiff's Relevant Medical History

Plaintiff alleges that he has been disabled and unable to work since 2018 due to unstable angina, tingling in his left arm, bilateral leg pain, chest pain, heart palpitations, shortness of breath, chronic fatigue, high blood pressure, lightheadedness, and dizziness.  (*Id*. at 79)  Relevant evidence of record regarding those conditions is set out below.

Plaintiff was initially diagnosed with coronary heart disease on December 19, 2018, after he underwent a cardiac catheterization related to recurring chest pains.  (*Id*. at 371, 653)  A few days later, as part of a coronary intervention procedure, he also had cardiac stents placed in his heart to address his angina.  (*Id*. at 662-63)  Plaintiff was treated with medications and told to return if the chest pain symptoms persisted.  (*Id*. at 371)  This procedure and medication largely alleviated Plaintiff's conditions for about a year, though at times he suffered from numbness and pain in his legs during this period.  (*See id*. at 556, 558, 560, 565, 589, 646, 650, 653, 667)

In June 2020, Plaintiff reported to his medical providers that his chest pains and related symptoms had returned, as of December 2019.  (*Id*. at 588-89)  During the first half of 2020, Plaintiff would treat chest pain with rest and nitroglycerin; the nitroglycerin typically reduced his symptoms within five to 10 minutes.  (*Id*. at 573)  By mid-2020, Plaintiffs' angina-related symptoms caused him to undergo related medical procedures on multiple occasions; these

3

included another cardiac catheterization and percutaneous coronary intervention (or "PCI") on July 15, 2020.  (*Id*. at 586, 588-90, 699-700, 749-50)  Once again, Plaintiff's symptoms subsided afterwards, and he continued to routinely take his prescribed medicine.  (*Id*. at 791)

Plaintiff's chest pain returned in November 2020, and in February 2021, Plaintiff ultimately again sought medical treatment for recurring angina and coronary artery disease.  (*Id*. at 700, 750, 875)  At this time, Plaintiff reported his chest pains were similar to the pains he experienced before the July 2020 PCI procedure.  (*Id*. at 700, 750)  A third catheterization revealed mild nonobstructive coronary artery disease; more stents were inserted during this procedure.  (*Id*. at 757)

Plaintiff  continued to experience chest pains three days thereafter, and he alleged that the pain was constantly present and would come in waves.  (*Id*. at 792)  Although Plaintiff's doctor now believed this pain may stem from something other than Plaintiff's angina, Plaintiff underwent a fourth catheterization in April 2021.  (*Id*. at 792, 829-30, 875)  The results established that Plaintiff did not have coronary artery disease and that his chest pains were non-cardiac.  (*Id*. at 829, 875)

### 2.     The Administrative Hearing

At the first administrative hearing, which was held via telephone on May 4, 2021, the ALJ heard testimony from Plaintiff and from his wife, Sherry Colon.

### a.     Plaintiff's Testimony

Prior to Plaintiff's testimony, as part of a discussion of logistics relating to the hearing, the ALJ noted that a member of his United States Social Security Administration ("SSA") office had previously contacted Plaintiff and had informed him of his right to be represented by an attorney in the proceeding; Plaintiff confirmed that this was so, and explained that he had

acknowledged during that conversation that he understood his right to representation.  (*Id*. at 45-46)  The ALJ then asked Plaintiff to reaffirm that he understood his right to representation as it had been previously explained; Plaintiff again confirmed that he did.  (*Id*. at 46)  In light of this, the ALJ determined that Plaintiff had been properly informed about this right and would be proceeding without a representative.  (*Id.*)

Plaintiff thereafter began his testimony by providing some personal history.  He explained that in the past, he had worked at various retail stores as a loss prevention officer or store detective; in those jobs, he walked the floor, monitored security cameras, kept an eye out for potential shoplifters and apprehended shoplifters.  (*Id*. at 50-52)  At these jobs, Plaintiff said he spent about six hours in an eight-hour day on his feet, and he claimed that about every 45 minutes he had to run down a shoplifter.  (*Id*. at 52)

One day at work in the summer of 2018, Plaintiff said that he had to climb stairs to reach a fire.  (*Id*. at 53)  As he was doing this, he began to feel his chest tighten; he ultimately ended up in the hospital.  (*Id*. at 53-54)  Plaintiff said that he received medication during this hospital stay, but nevertheless had a heart attack the next day, which required surgery.  (*Id*. at 54)  This, according to Plaintiff, is what set off the chain of events leading him to the hearing.  (*Id*.)

The ALJ asked Plaintiff about his December 2018 catheterization.  Plaintiff said that after that procedure, his chest felt less sore, but he still continued to have breathing problems, occasional lightheadedness, and numbness and tingling in his legs that caused him to occasionally fall down.  (*Id*. at 55)  Plaintiff said that his doctors instructed him to get a cane.  (*Id*. at 56)

Plaintiff informed the ALJ that he gets shortness of breath from regular activities, such as making a sandwich. (*Id*. at 58) When that happens, he will usually go lay down and rest, while Plaintiff's wife and children will step in to help when they can. (*Id*. at 58-59)

### b.    Mrs. Colon's Testimony

Mrs. Colon also testified to Plaintiff's symptoms. She explained that she works from home, and observes Plaintiff during the day. (*Id*. at 60-61) Mrs. Colon stated that Plaintiff's chest pains were constant throughout the day and that Plaintiff tried to minimize his activity to avoid the tightness in his chest. (*Id*. at 61) Ms. Colon was constantly monitoring Plaintiff to make sure he got medical attention or medication as necessary. (*Id*. at 61-62) When the ALJ questioned Mrs. Colon about Plaintiff's household activities, she said he may bring a lightweight item to the kitchen, but he is generally unable to help with housekeeping (e.g., with taking out the trash). (*Id*. at 62) Even small tasks, Ms. Colon testified, would trigger Plaintiff's chest pain and shortness of breath. (*Id*.)

Mrs. Colon told the ALJ that Plaintiff has always been a man who wanted to work; she said that he had to stop working due to this pain in 2018, and that this was very concerning and out of character for him. (*Id*. at 63)

### c.    Conclusion of Hearing

At the end of the first hearing, the ALJ explained that he wanted to get more information about the Plaintiff's recent April 2021 catheterization procedure, and that he might also send Plaintiff's file out to an expert, who would provide a report on it. (*Id*. at 64) The ALJ noted that depending on what this additional information showed, he might have to have Plaintiff come back for a supplemental hearing. (*Id*.)

### 3.    The Supplemental Hearing

At the beginning of the supplemental hearing, which was held via telephone on October 5, 2021, the ALJ reminded Plaintiff that at the first hearing he had noted that Plaintiff had a right to representation during the proceedings. (*Id.* at 70)  The ALJ asked again whether Plaintiff had understood this right, and Plaintiff again confirmed that he did. (*Id.* at 70-71)

The ALJ went on to explain that after the first hearing, he had decided to send Plaintiff's file to a medical expert. (*Id.* at 71)  He also noted that in the interval, Plaintiff had written in to request that a supplemental hearing be convened, which had prompted the instant hearing. (*Id.*)  The ALJ also stated that Louis Szollosy, a vocational expert, was present by telephone during the supplemental hearing. (*Id*. at 69)  Mr. Szollosy did not testify during the hearing, however.

Since Plaintiff requested the supplemental hearing, the ALJ first gave Plaintiff the opportunity to speak. (*Id*. at 71)  However, Plaintiff explained that he had not yet reviewed his medical file. (*Id*. at 71-72)  The ALJ noted that during the time period in which he was going to send Plaintiff's file out to be reviewed by a cardiologist, he would leave the record open, so that Plaintiff could later provide any additional comments that he wished to make about the file. (*Id*. at 72)  Otherwise, the ALJ asked if Plaintiff or his wife had anything further they wished to add to the record; Plaintiff responded by saying that his wife would like to speak. (*Id*.)

At the start of her testimony, Mrs. Colon stated that there had been minimal, if any, improvement in her husband's health since the May 4, 2021 hearing, despite continued follow up with cardiologists and other doctors. (*Id*. at 74)  Plaintiff had reportedly increased his intake of nitroglycerine to treat his ongoing chest pains. (*Id*.)  Mrs. Colon revealed that a CAT scan, recommended by Plaintiff's cardiologist, had revealed some problems with Plaintiff's liver or spleen. (*Id*. at 75)

Ms. Colon emphasized her worry for her husband given that these health issues were present during the COVID pandemic.  (*Id*.)  She continued to stay in the house with Plaintiff and monitor his prescriptions, but Plaintiff's symptoms remained; he was still not able to work.  (*Id*. at 75-76)

### 4.    Post-Hearing Evidence

After the administrative hearings, the ALJ, *inter alia*, requested that two experts provide answers to submitted interrogatories.

### a.    Medical Expert's Interrogatory Responses

On November 1, 2021, the ALJ requested that Anne Mani, M.D., a cardiologist, complete medical interrogatories, based on her review of Plaintiff's medical records.  (*Id*. at 889)  Dr. Mani reviewed Plaintiff's treatment notes and responded to the ALJ's request.  (*Id*. at 902-11)  In rendering her opinion, Dr. Mani relied in significant part upon records regarding Plaintiff's April 2021 catheterization—i.e., wherein Plaintiff's doctors noted that there was no sign that Plaintiff had obstructive coronary artery disease, and that Plaintiff had no specific limitations from a cardiac standpoint.  (*Id*. at 902-07 (citing *id*. at 875-84))  Dr. Mani, *inter alia*, deemed Plaintiff able to walk and stand for up to eight hours during an eight-hour work day, though she noted that walking and standing were limited to one-hour increments.  (*Id*. at 903)  Further, Dr. Mani found that Plaintiff did not require a cane.  (*Id*.)

### b.    Vocational Expert's Interrogatory Responses

On December 2, 2021, the ALJ requested that Mr. Szollosy, the vocational expert, answer certain interrogatories.  (*Id*. at 297-302)  Therein, Mr. Szollosy responded to a hypothetical question posed by the ALJ.  (*Id*. at 305-07)  The hypothetical question asked:

Assume a hypothetical individual who was born on [Plaintiff's birthdate], 1963, who has at least a high school education as defined in [relevant regulations], and has work experience as [described above, i.e., as a shopping investigator or security officer]. Assume further that this individual has the residual functional capacity (RFC) to perform medium work as defined in [relevant regulations] except 50/20; 6/8 hours stand/walk; 6/8 hours sit; occasionally climb stairs and ramps; occasionally climb ladders or scaffolds, occasionally balance, stoop, kneel, crouch and crawl; avoid unprotected heights; can tolerate occasional exposure to moving mechanical parts; can [tolerate] frequent exposure to operating a motor vehicle; can tolerate frequent exposure to humidity; wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibrations; can tolerate exposure to loud noise.

(*Id*. at 306) The ALJ then asked whether this type of individual could perform any of Plaintiff's past jobs as a shopping investigator or security officer; Mr. Szollosy responded that the person could perform all such past work. (*Id*.) Mr. Szollosy also found that the hypothetical person could perform certain unskilled jobs in the national economy, such as hand packager, checker (inspector/sorter) and order fulfiller (production worker). (*Id*.)

### 5.    The ALJ's Findings

On January 19, 2022, the ALJ issued his decision, which included the following 7 findings:

1. The claimant meets the insured status requirement of the Social Security Act through March 21, 2022. . . .

2. The claimant has not engaged in substantial gainful activity since March 11, 2018, the alleged onset date (20 CFR 404.1571 *et seq*.). . . .

3. The claimant has the following severe impairment: coronary artery disease (20 CFR 404.1520(c)). . . .

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of

9

the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). . . .

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except lift/carry 50 pounds occasionally and 20 pounds frequently; stand and/or walk 6 hours out of an 8-hour workday; sit 6 hours out of an 8-hour workday; occasionally climb ramps and stairs; occasionally climb ladders or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; avoid unprotected heights; can tolerate occasional exposure to moving mechanical parts; can tolerate frequent exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibrations; can tolerate exposure to loud noise. . . .

6.  The claimant is capable of performing past relevant work as a shopping investigator and security officer.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565). . . .

7.  The claimant has not been under a disability, as defined in the Social Security Act, from March 11, 2018, through the date of this decision (20 CFR 404.1520(f)).

(*Id.* at 23-28)

## II.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining the appropriateness of summary judgment, the Court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party' but not weighing the evidence or making credibility determinations."  *Hill v. City*

*of Scranton*, 411 F.3d 118, 124-25 (3d Cir. 2005) (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

### B.    Other Relevant Legal Standards

Courts have plenary review regarding the Commissioner's legal conclusions. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). The Court must uphold the Commissioner's factual findings if they are supported by "substantial evidence[.]" *See* 42 U.S.C. § 405(g); *Sykes*, 228 F.3d at 262. "Substantial evidence" may be less than a preponderance of the evidence but must be more than a mere scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (internal quotation marks and citation omitted). In analyzing whether substantial evidence supports the Commissioner's factual findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986).

In determining whether a person is disabled,[2] the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R §§ 404.1520 & 416.920; *see also Russo v. Astrue*, 421 F. App'x 184, 188 (3d Cir. 2011). The United States Court of Appeals for the Third Circuit

---

[2]    A "disability" is defined for purposes of DIB as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [12] months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A); *see also Tate v. Berryhill*, C.A. No. 15-604-LPS, 2017 WL 1164525, at *5 (D. Del. Mar. 28, 2017). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003); *Tate*, 2017 WL 1164525, at *5.

has explained this sequential analysis, and the shifting burdens with respect to each step, in

detail:

> The first two steps involve threshold determinations. In step one, the Commissioner must determine whether the claimant currently is engaging in substantial gainful activity. [] If a claimant is found to be engaging in substantial gainful activity, the disability claim will be denied. [] In step two, the Commissioner must determine whether the claimant has a medically severe impairment or combination of impairments. [] If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. [] In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. [] If the impairment is equivalent to a listed impairment the disability claim is granted without further analysis. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. [] Step four requires the ALJ to consider whether the claimant retains the [RFC] to perform his past relevant work. The claimant bears the burden of demonstrating an inability to return to his past relevant work. [] If the claimant does not meet the burden the claim is denied.
>
> If the claimant is unable to resume his former occupation, the evaluation moves to the final step. [] At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. [] The Commissioner must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his or her medical impairments, age, education, past work experience, and residual functional capacity. [] The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he is capable of performing work and is not disabled.

*Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (internal citations omitted).

## III.   DISCUSSION

On appeal, Plaintiff presents three arguments relevant to his request for remand: (1) that

the ALJ failed to obtain a valid waiver of Plaintiff's right to representation; (2) that Plaintiff

suffered prejudice in the administrative proceeding because the ALJ wrongly used "complex

interrogatory procedures[,]" rather than hearing testimony, in developing the administrative record; and (3) that the ALJ failed to consider whether Plaintiff's coronary artery disease caused work-preclusive limitations for any continuous period of 12 months. (D.I. 17 at 1) The Court will address these arguments in turn below.

**A.    Did the ALJ Fail to Obtain a Valid Waiver of Plaintiff's Right to Representation?**

Plaintiff's first argument is that the ALJ failed to obtain a knowing and intelligent waiver of his right to be represented by counsel at the administrative hearings. (*Id*. at 2-5) The Court begins below by setting out the relevant legal standards. Thereafter, it will address the substance of Plaintiff's arguments.

**1.    Legal Standards**

A claimant does not have a constitutional right to counsel at an SSA disability hearing, *Phifer v. Comm'r of Soc. Sec.*, 84 F. App'x 189, 190 (3d Cir. 2003); *Vivaritas v. Comm'r of Soc. Sec.*, 264 F. App'x 155, 157 (3d Cir. 2008), but he does have a statutory and regulatory right to counsel at such a hearing, pursuant to 42 U.S.C. § 406 and 20 C.F.R. § 404.1705, *Vivaritas*, 264 F. App'x at 157. In light of this, a claimant must be given notice of this right to representation, and he "can waive th[e] right only by knowing and intelligent waiver." *Id*. If the claimant does waive this right and then proceeds *pro se*, "the ALJ has a duty to help the claimant develop the administrative record and 'must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Id*. at 157-58 (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).

The fact that that a claimant is unrepresented and has knowingly waived his right to counsel "in and of itself is not a sufficient justification for remand." *Phifer*, 84 F. App'x at 190;

13

*see Hess v. Sec'y of Health, Ed. & Welfare*, 497 F.2d 837, 840 n.4 (3d Cir. 1974); *see also*

*Livingston v. Califano*, 614 F.2d 342, 345 (3d Cir. 1980).  Rather, remand is proper only if "it is

clear that the lack of counsel prejudiced the claimant or that the administrative proceeding was

marked by unfairness due to the lack of counsel[.]"  *Livingston*, 614 F.2d at 345; *see also*

*Vivaritas*, 264 F. App'x at 158.

A determination of whether the claimant waived the right to counsel knowingly and

intelligently determines who has the burden of demonstrating whether remand is appropriate.

*Vivaritas*, 264 F. App'x at 158.  If the ALJ does not obtain a valid waiver of counsel, then the

burden is on the Commissioner to show that the ALJ adequately developed the record.  *Id*.  On

the other hand, when the claimant's waiver is knowing and intelligent, then the burden is on the

claimant to establish prejudice by demonstrating that the ALJ failed to adequately develop the

record.  *See E.M. v. Comm'r of Soc. Sec.*, Civil Action No. 20-3671 (SRC), 2021 WL 3163984,

at *2 (D.N.J. July 27, 2021); *McGrew v. Colvin*, No. 13cv0144, 2013 WL 2948448, at *4 (W.D.

Pa. June 14, 2013).

### 2.    Discussion

The Third Circuit has not adopted a rigid protocol that the Commissioner must follow in

order to obtain a knowing and intelligent waiver.  *Morris v. Comm'r of Soc. Sec.*, Civ. No. 17-

757-KM, 2018 WL 395736, at *4 (D.N.J. Jan. 12, 2018).[3]  But in a number of opinions, the

---

[3]    Plaintiff urges the Court to adopt the approaches of the United States Court of Appeals for the Seventh Circuit and/or the United States Court of Appeals for the Eleventh Circuit as to this issue.  Those courts have identified certain topics that the SSA must apprise a claimant of with regard to the right to representation—and have determined that if any of those topics are not explicitly covered with the claimant, then a waiver of counsel will not be deemed valid.  For example, the Seventh Circuit has held that "[t]o ensure valid waivers, ALJs must explain to pro se claimants '(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney

Third Circuit has provided guidance as to examples of what *would* amount to a knowing and intelligent waiver.  For example:

- In *Phifer v. Comm'r of Soc. Sec.*, 84 F. App'x 189 (3d Cir. 2003), the Third Circuit found knowing and intelligent waiver where the plaintiff received two letters prior to his hearing that stated that he had a right to representation, and where at the beginning of his hearing, the plaintiff confirmed that he understood that he could be represented by counsel but was choosing to proceed without an attorney or qualified representative.  84 F. App'x at 191.

- In *Boyd v. Barnhart*, 98 Fed. App'x 146 (3d Cir. 2004), the Third Circuit found a knowing and intelligent waiver where: (1) the claimant had received by mail "notification of her right to representation throughout the administrative proceedings on

---

fees to 25 percent of past due benefits and required court approval of the fees.'" *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citations omitted).  The Eleventh Circuit has similarly held that "[t]he right of representation may be waived, provided that the claimant is 'properly appraised' of her representation options, including the possibility of free counsel and limitations on attorney's fees to twenty-five percent of any eventual award." *Polk v. Soc. Sec. Admin., Comm'r*, 579 F. App'x 843, 847 (11th Cir. 2014) (citation omitted).

The Court, however, declines to utilize the Seventh Circuit's or Eleventh Circuit's rigid tests here, particularly in light of the Third Circuit's guidance in *Vivaritas v. Comm'r of Soc. Sec.*, 264 F. App'x 155 (3d Cir. 2008).  In *Vivaritas*, the Third Circuit cited approvingly in certain respects to Seventh Circuit case law.  *Vivaritas*, 264 F. App'x at 158 (citing *Skinner*, 478 F.3d at 842; *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994)).  However, at another point in the opinion, the *Vivaritas* Court:  (1) specifically noted the three above-referenced categories of information that the Seventh Circuit requires an ALJ to explain to a claimant, in order for the ALJ to sufficiently ensure a valid waiver of counsel; and (2) pointedly stated that "we have not required that ALJs explain each of these listed items that the [Seventh Circuit's] case law requires." *Id.* at 157 n.1; *see also Verbanac v. Kijakazi*, Civil Action No. 20-1506, 2022 WL 395246, at *2 n.3 (W.D. Pa. Feb. 9, 2022) (refusing to adopt the Seventh Circuit's notice standard in light of this language in *Vivaritas*).  In *Vivaritas*, the Third Circuit seems to have been indicating disapproval of the use of a rigid test in this area—and suggesting that the relevant inquiry should be a flexible one that takes into account all relevant information.  This makes sense.  The Court can see how if a claimant is given a fulsome description of his right to representation prior to any waiver, then such a description could be deemed sufficient—even if the Commissioner did not (for example) make a specific reference to the 25 percent fee cap.  *See Charlier, ex rel. Charlier v. Colvin*, Civil Action No. 13-1661, 2014 WL 5713272, at *2 n.4 (W.D. Pa. Nov. 5, 2014) (concluding the same).

15

six separate occasions, including a listing of available representation"; (2) where one such notice included the SSA's "Your Right to Representation" pamphlet (discussed further below); and (3) where the ALJ gave the claimant instructions about the availability of counsel at the hearing, and offered to continue the hearing to permit her to secure a representative. 98 Fed. App'x at 147.

- In *Vivaritas v. Comm'r of Soc. Sec.*, 264 F. App'x 155 (3d Cir. 2008), the Third Circuit suggested that the following fact pattern would "[o]rdinarily be" sufficient[4] to ensure a knowing and intelligent waiver: (1) the claimant had received a list of possible representatives along with his Notice of Hearing; (2) the ALJ confirmed that the claimant had a right to representation, but was not required to utilize a representative, and offered the claimant an additional copy of the list of representatives; (3) the ALJ described some of the things a representative could do to assist a claimant prior to or at a hearing, and noted that some representatives do not charge a fee; (4) the ALJ noted that the hearing could be delayed by 30 days if the claimant wished for more time to get a representative, or that the ALJ could seek additional documents for the record if needed, were the hearing to proceed that day; and (5) the ALJ confirmed that the claimant wished to proceed with the hearing that day. 264 F. App'x at 157-59.

Going forward, the Court will be guided by the results of these cases in assessing Plaintiff's argument about the lack of knowing and intelligent waiver.[5]

---

[4]    In *Vivaritas*, the Third Circuit ultimately suggested that the claimant's waiver may not have been knowing and intelligent—in light of the fact that the claimant had significant mental limitations at the time of the hearing, which could have impaired her ability to understand her rights. *See Vivaritas*, 264 F. App'x at 159. In this case, Plaintiff does not suggest that he has any such mental impairment that would be relevant to the waiver issue; indeed, he has earned his GED and he was able to capably answer the ALJ's questions during his administrative hearings. (*See* D.I. 22 at 7 (citing Tr. at 40-77, 171-75, 207, 236, 240-45); D.I. 23)

[5]    District courts in the Third Circuit have similarly tended to look to the factual circumstances in these cases, in order to help gauge whether a claimant's waiver was knowing and intelligent. *See, e.g.*, *McGrew*, 2013 WL 2948448, at *7; *Bentley v. Comm'r of Soc. Sec.*, Civil Action No. 10-2714 (DMC), 2011 WL 4594290, at *9 & n.6 (D.N.J. Sept. 30, 2011); *Morris*, 2018 WL 395736, at *6.

The Court next turns to the facts of record. As the Court will set out below, they show how on many different occasions prior to the ALJ's decision, Plaintiff received substantial amounts of information regarding his right to representation.

Plaintiff was first informed of his right to representation when he received an April 15, 2020 notice of his disapproved claim ("Notice of Disapproved Claim"). (Tr. at 92-96) The Notice of Disapproved Claim included a section titled "If You Want Help With Your Appeal"; this section informed Plaintiff that he may choose to have a representative help him, explained that some representatives may work for free or on a contingent basis, and noted that his local SSA office could give him a list of groups that could help him find a representative. (*Id*. at 92-93)[6]

After submitting a request for reconsideration, (*id*. at 97), Plaintiff received a disability reconsideration notice ("Reconsideration Notice") denying Plaintiff DIB, (*id*. at 98-102). The Reconsideration Notice included an "IF YOU WANT HELP WITH YOUR APPEAL" section with language very similar to that in the Notice of Disapproved Claim. (*Id*. at 98)

Plaintiff then submitted a Request for Hearing by an Administrative Law Judge. In this document, Plaintiff confirmed his understanding of the right to representation and indicated his understanding that, if he needed representation, the Social Security office or the hearing office

---

[6]    More specifically, the "If You Want Help With Your Appeal" section read as follows: "You may choose to have a representative help you. We will work with this person just as we would work with you. If you decide to have a representative, you should find one quickly so that person can start preparing your case. Many representatives charge a fee. Some charge a fee only if you receive benefits. Others may represent you for free. Usually, your representative may not charge a fee unless we approve it. Your local Social Security office can give you a list of groups that can help you find a representative. If you get a representative, you or that person must notify us in writing. You may use our Form SSA-1696-U4 'Appointment of Representative.' Any local Social Security office can give you this form." (Tr. at 92-93)

could give him a list of legal referral and service organizations that would help him to obtain

counsel.  (*Id*. at 103-04)

    Next, on November 17, 2020, the SSA's Office of Hearing Operations sent Plaintiff an

acknowledgement letter regarding his request for a hearing ("Acknowledgement Letter").  (*Id*. at

105-16)  In addition to explaining the hearing process and attaching supplemental materials, the

Acknowledgement Letter included a section titled "Your Right to Representation"; this section

contained language regarding representation that was substantially identical to that in the

Reconsideration Notice.  (*Id*. at 105-06)  Among the supplemental materials provided along with

the Acknowledgement Letter was the two-page "Your Right to Representation" pamphlet

previously referenced above (hereafter, the "Pamphlet").  (*Id*. at 109-10)  The Pamphlet includes

a vast amount of information on the topic, including:  (1) a statement that "[Plaintiff] can have a

representative, such as an attorney" to help him when interacting with the SSA; (2) an

explanation of "[w]hat a representative can do[,]" which lists various ways in which that person

could assist, including by helping the claimant obtain information from his SSA file or medical

records, by requesting hearings and by preparing for hearings with the claimant; (3) a section

titled "[c]hoosing a representative[,]" that explains certain regulations as to who can represent a

claimant, how the claimant could identify possible representatives, and the possibility of free

representation; (4) a section titled "[w]hat your representative may charge you" that provides

guidance on fee arrangements, and explains that an approved fee will not exceed 25 percent of

past-due benefits or $6,000, whichever is less; and (5) other logistical information, including

how to contact the SSA with questions.  (*Id*.)  Also among the included materials was a

document titled "Important Notice About Representation[.]"  (*Id*. at 111)  This document again

explained that a representative could assist a claimant with SSA matters, discussed how free

representation was possible, and listed seven different organizations (including five in Delaware) that could provide information about possible attorney representation. (*Id.* (providing contact information for attorney, non-attorney and free legal representation organizations))

Then, less than three months before his initial hearing, Plaintiff received a February 12, 2021 Notice of Hearing ("Notice"). (*Id.* at 117-21) This Notice included a section titled "If You Want Help With Your Appeal[,]" which provided similar information about representation to that in the Reconsideration Notice. (*Id.* at 118) And accompanying the Notice was another copy of the Pamphlet. (*Id.* at 122-23)

In addition to these five different written forms of notice, Plaintiff also received oral notifications about his right to representation. In that regard, the SSA's internal Hearings, Appeals and Litigation Law Manual ("HALLEX")[7] states that before a hearing, the SSA's Hearing Office ("HO") staff may contact an unrepresented claimant; during this pre-hearing development contact ("PDC"), the "staff must verify that the claimant is unrepresented[,] inform the claimant of the right to representation" and obtain the claimant's affirmation of understanding. HALLEX I-2-1-80(A)(2). Pursuant to HALLEX, the HO staff member is supposed to apprise the claimant of the following:

- There is no requirement that a claimant obtain representation.;

- The SSA will make every reasonable effort to obtain relevant records should the claimant be unrepresented.;

- The benefits of appointing a representative (such as having assistance in obtaining evidence and presenting the claims at the hearing).;

---

[7] "HALLEX defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the [administrative h]earing, Appeals Council, and Civil Action levels." HALLEX I-1-0-1.

- The claimant should find a representative as soon as possible if they wish to have one.;

- Some representatives charge a fee, while others may represent the claimant for free; and

- If the claimant seeks to reschedule the hearing to obtain representation, the ALJ may deny that request absent good cause.

*Id*. If Agency staff communicates the requisite information to the claimant and obtains the claimant's affirmation of understanding, the correspondence is memorialized in a "Report of Contact[.]" *Id*.

In this case, on March 29, 2021 (i.e., over a month before the initial administrative hearing), Robert Foth, a representative from the SSA's Dover Hearing Office, contacted Plaintiff via telephone. (Tr. at 277) The Report of Contact that Mr. Foth authored indicates that he "informed [Plaintiff] of the Right to Representation with [Plaintiff] affirming the understanding of that information." (*Id*.) This document states that Plaintiff was given "contact information for a representative's organization in his area" and was told "that the [SSA] may not grant a postponement to obtain representation absent good cause." (*Id*.; *see also* D.I. 17 at 4)

As was previously noted above, Plaintiff ultimately appeared at the May 5, 2021 hearing without representation. (Tr. at 45-46) The ALJ recognized at the start of the hearing that Plaintiff was unrepresented, and Plaintiff subsequently confirmed this. (*Id*. at 45) The ALJ then asked Plaintiff if he recalled the prehearing contact from Mr. Foth and the information he received regarding his right to representation. (*Id*.) Plaintiff responded to both questions in the affirmative. (*Id*.) Plaintiff verified twice that at the time of his pre-hearing contact with Mr. Foth, he understood his right to representation. (*Id*. at 46) Based on this information, the ALJ

20

"determin[ed] that [Plaintiff had] been properly informed about [his] right to representation and [would] be proceeding without a representative." (*Id.*)

After that initial hearing, Plaintiff received a July 21, 2021 Notice regarding his upcoming supplemental hearing. (*Id.* at 142-46)  This notice included the "If You Want Help With Your Appeal" section. (*Id.* at 143)  And accompanying the document was yet another copy of the Pamphlet. (*Id.* at 147-48)

Then, prior to the supplemental hearing, Mr. Foth again spoke with Plaintiff and his wife on September 2, 2021. (*Id.* at 294)  A Report of Contact regarding that conversation again indicates that Mr. Foth "informed [Plaintiff and his wife] of the Right to Representation with claimant affirming the understanding of that information"; Mr. Foth reported that he also again provided Plaintiff with "contact information for a representative's organization in their area" and "informed [Plaintiff and his wife] that the [SSA] may not grant a postponement to obtain representation absent good cause." (*Id.*)

At the beginning of the supplemental hearing on October 5, 2021, the ALJ reminded Plaintiff that at the first hearing he had explained how the Plaintiff had a right to representation during these proceedings. (*Id.* at 70)  The ALJ asked again whether Plaintiff had understood this right, and Plaintiff again confirmed that he did. (*Id.* at 70-71)

In sum, prior to the issuance of the ALJ's January 2022 decision,[8] on six different occasions,[9] Plaintiff received written documentation discussing his right to representation.

---

[8]    When Plaintiff was provided with the ALJ's decision, he was also notified in writing of his right to representation in any appeal. (Tr. at 19-20)  Plaintiff thereafter obtained his current counsel, who assisted him with this appeal. (*Id.* at 316-17)

[9]    In total, HALLEX lists five different written notices that claimants should receive prior to an administrative hearing, which will advise them of their right to representation. *See*

Together, these documents provided significant detail describing: (1) how an attorney could aid in the proceedings; (2) the possibility of free counsel or a contingency arrangement; (3) the fact that attorney's fees would be limited in various ways; and (4) how to contact organizations that could help Plaintiff locate representation. On two different occasions, an SSA hearing officer also provided details to Plaintiff about his right to representation and gave Plaintiff contact information for a local representative's organization. And then in both of Plaintiff's hearings, the ALJ raised this issue again, confirmed with Plaintiff that he had been informed of the contours of his rights in this area, and then (with no dissent from Plaintiff) moved forward with the hearings.[10]

---

HALLEX I-2-1-80. All are a part of the instant record, and there is no dispute here that Plaintiff actually *received* these notices. In its briefing, the Commissioner discussed the fact that Plaintiff had received them. (D.I. 22 at 5-6) And in his reply brief, Plaintiff never argued to the contrary. (D.I. 23)

The Court also notes that in his briefing, Plaintiff does not argue that even though he received these notices, he did not *review* them (or that he reviewed them, but did not *understand* them). (*Id.*); *see also Hartwell v. Astrue*, No. EDCV 12-01652(SH), 2013 WL 1855792, at *2 & n.2 (C.D. Cal. Apr. 30, 2013).

[10]     In his opening brief, Plaintiff suggests that the ALJ's approach was deficient in the hearings because after confirming that Plaintiff had been advised of his right to representation, the ALJ never formally asked Plaintiff "whether he was choosing to proceed without representation" and "instead, . . . merely informed [Plaintiff] that the hearing would proceed." (D.I. 17 at 3; *see also id.* at 4) In the Court's view, that characterization is not fair to the ALJ, nor reflective of the record. Instead, the record shows that the ALJ indicated to Plaintiff that he had a choice to proceed with or without representation, and that Plaintiff *made the choice* to do the latter. As noted above, at the initial hearing, the ALJ explained that Plaintiff had been informed of his right to have a representative, and noted that because Plaintiff nevertheless was present at the hearing without counsel, the ALJ was presuming that Plaintiff intended to "proceed[] without a representative." (Tr. at 46) If that it was not Plaintiff's wish to do so, then Plaintiff surely could have and would have told the ALJ this. Instead, Plaintiff went forward with the hearing. The Court sees nothing in the ALJ's colloquies here that violated the law.

In light of all of this—and considering the content of all of the written notices and oral conversations together—the Court concludes that Plaintiff surely knew of the full contours of his right to representation, and made a knowing and intelligent decision to waive that right and proceed on his own.

Plaintiff puts forward two primary arguments to the contrary. Neither are persuasive.

First, Plaintiff makes an argument relating to the record (or lack thereof) about the Commissioner's *verbal* statements to him as to this issue. Here Plaintiff begins by noting that at his two hearings, the ALJ did not *verbally review* all of the aspects of the right. (D.I. 17 at 3-4) He argues that this is in contravention of the HALLEX, which states that an ALJ should "explain the availability of both free legal services and contingency representation and discuss access to organizations that assist individuals in obtaining representation." HALLEX, I-2-1-80 (*cited in* D.I. 17 at 3). Plaintiff asserts that this portion of the HALLEX amounts to an "independent duty" that the ALJ was bound to follow—and that any noncompliance is "legal error requiring remand[.]" (D.I. 23 at 1)

In making this argument, Plaintiff acknowledges that he also had a verbal conversation with Mr. Foth of the SSA before each of his two hearings (as is memorialized in the two Reports of Contact). But Plaintiff argues that these conversations with Mr. Foth are of no moment. To that end, Plaintiff notes how the Report of Contact do not include a specific statement that during these calls Plaintiff, for example, "was informed of the availability of free or low cost representation, contingency fee arrangements . . . , or the benefit of a representative at the administrative hearing." (D.I. 17 at 4 (citing Tr. at 277); *see also id.* (citing Tr. at 294)) And so Plaintiff argues that "it is impossible to tell from the report[s] whether [he] was informed of" these matters by Mr. Foth. (*Id.*) Therefore, Plaintiff asserts that the SSA's procedures were

insufficient—since there is not evidence that anyone (including the ALJ or Mr. Foth) verbally laid out the substance of the right to representation with him, prior to or during his hearings.

The Court cannot credit this multi-pronged argument, for a few reasons.

As an initial matter, even if it were true that the ALJ did not follow the HALLEX's requirements in all respects during the administrative hearings, this would not be dispositive. That is because the HALLEX does not have the force of law and creates no judicially enforceable rights. *See, e.g.*, *Moraes v. Comm'r Soc. Sec.*, 645 F. App'x 182, 186 (3d Cir. 2016); *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 859 (3d Cir. 2007); *Ralston v. Astrue*, Civil Action No. 10-548-GMS, 2015 WL 1457627, at *9-10 (D. Del. Mar. 27, 2015).

Moreover, the very portion of the HALLEX that Plaintiff puts at issue indicates that an ALJ should discuss the above-referenced matters at the hearing *only to the extent* that the claimant *did not* already discuss such matters during a pre-hearing contact with the SSA.[11] *Cf. Henderson v. Commissioner, SSA*, CIVIL ACTION NO. 4:21-CV-00797-SDJ-CAN, 2022 WL 17842615, at *4-5 (E.D. Tex. Nov. 17, 2022) (concluding that the ALJ had ensured that the claimant made a knowing and intelligent waiver, where the SSA provided pre-hearing notice via telephone of the right to representation, and at the hearing, the ALJ simply provided a brief "final oral reminder").  And on that front, of course, Plaintiff *did* have pre-hearing contacts with Mr. Foth.

---

[11]     The HALLEX states that if the record shows that a claimant *did* have a pre-hearing development contact with the SSA, then the ALJ need only "state on the record that the claimant was advised of the right to representation during the [contact]."  HALLEX I-2-1-80(B)(1).

As for the argument that those pre-hearing contacts should not count, the Court disagrees. The record is sufficient to support the conclusion that Plaintiff was verbally appraised of the substance of his rights during his conversations with Mr. Foth.  Now, it is true that the Reports of Contact do not spell out all of the substance of Mr. Foth's discussion with Plaintiff.  But as noted above, SSA procedures (set out in the HALLEX) state that Mr. Foth was expected to discuss various aspects of the right to representation during these calls, including the benefits of appointing a representative, or the availability of free representation.  It is a fair inference that those procedures were followed here.  *See Henderson*, 2022 WL 17842615, at *4-5 (citing to a similar description of the content of a pre-hearing contact in support of the proposition that a claimant was "made aware of his right to counsel" during that communication); *Creel v. Comm'r of Soc. Sec.*, CIVIL NO. 2:21-cv-00039-HSO-BWR, 2022 WL 4287655, at *4 (S.D. Miss. Aug. 8, 2022) (relying on a one-page Report of Contact as evidence of "further notice of [the claimant's] right to representation through a pre-hearing telephone contact"), *report and recommendation adopted,* 2022 WL 3756513 (S.D. Miss. Aug. 30, 2022).[12]

Additionally, even if there was some uncertainty about whether Mr. Foth in fact verbally described significant components of the right to representation with Plaintiff, Plaintiff surely received sufficient *written* articulation of these matters prior to his hearing.  Those written notices covered all of the information about the right that Plaintiff suggests that he may not have heard from the ALJ or Mr. Foth—and much more.  And caselaw from this Circuit states that if a Plaintiff learns about the key contours of this right in writing, this can be enough to support a

---

[12]    *But see Devlin v. Kijakazi*, Case No. 21-cv-1309-pp, 2023 WL 3750228, at *5 (E.D. Wis. May 31, 2023).

later knowing and intelligent waiver of the right (i.e., in the same way as if the claimant had learned of these details via a verbal conversation). *See Boyd*, 98 F. App'x at 147 (finding that the plaintiff's receipt of six separate notifications of the right to representation, including the Pamphlet and a list of available representatives, was sufficient to inform her of the right to representation); *Phifer*, 84 F. App'x at 191 (finding that because the plaintiff had received two letters from the SSA advising him that he had a right to legal representation, this "alone show[ed] that [the claimant] was given adequate notice of his right to counsel"); *Glenn ex rel. Norfleet v. Comm'r of Soc. Sec.*, 67 F. App'x 715, 718 (3d Cir. 2003) (finding that the claimant was properly appraised of the right to representation when his mother was advised of her son's right to counsel "in notices mailed to her prior to the hearing and again by the ALJ at the start of the hearing").[13]  For all of these reasons, Plaintiff's first argument is not successful here.

Second, Plaintiff argues that the ALJ failed to obtain a written, signed waiver of the right to representation from Plaintiff—and that waiver is "not valid unless there is a *written* waiver[.]" (D.I. 23 at 1 (emphasis added); *see also* D.I. 17 at 5)  The Court is aware of no requirement that

---

[13]    *See also Williams v. Astrue*, C.A. No. 12-1098-GMS, 2016 WL 768469, at *8 (D. Del. Feb. 26, 2016) (finding the claimant had been sufficiently notified of the contours of her right to representation—including as to possible fee structures and about how to find a representative—where the SSA "repeatedly provided [the claimant]" with notifications by mail that addressed these subjects, even though the ALJ did not speak to these subjects at the hearing); *Bentley*, 2011 WL 4594290, at *9-10 (finding that the plaintiff's receipt of five different written notices from the SSA, similar to those received by Plaintiff here, were sufficient to advise the plaintiff of the substance of her right to representation); *Weakland v. Astrue*, Civil Action No. 08-22J, 2009 WL 734713, at *6-7 (W.D. Pa. Mar. 19, 2009) (concluding that there was a knowing and intelligent waiver, where the plaintiff was provided with a written notice explaining her right to representation, a list of organizations that provide free legal services and the Pamphlet, and where the plaintiff signed a waiver of her right).

the ALJ must get a written waiver in cases where a verbal waiver is set out on the record.[14]

Indeed, the HALLEX indicates that in such a circumstance, no written waiver is needed.  *See*

HALLEX I-2-1-80(B)(1) ("If the ALJ is satisfied that the claimant can make an informed

decision, the ALJ must secure from the claimant a verbal waiver on-the-record *or* a written

waiver, which will be marked as an exhibit.") (emphasis added); *see also Armond v. Soc. Sec.

Admin*., CIVIL ACTION NUMBER 24-385, 2024 WL 5324365, at *8-9 (E.D. La. Dec. 5, 2024)

(citing HALLEX I-2-1-80) (concluding the same), *report and recommendation adopted*, 2025

WL 92353 (E.D. La. Jan. 14, 2025); *Juszkowski v. Berryhill*, Case No. 18-14023, 2019 WL

7998876, at *8 (E.D. Mich. Nov. 30, 2019), *report and recommendation adopted sub nom*.

*Juszkowski v. Soc. Sec. Comm'r*, 2020 WL 467851 (E.D. Mich. Jan. 29, 2020).  To the extent

Plaintiff is arguing that a written waiver is absolutely required in all cases, he does so in error.

For the reasons set out above, the record demonstrates that Plaintiff made a knowing and

intelligent waiver of counsel.  Therefore, the burden is on Plaintiff to establish prejudice by

demonstrating that the ALJ failed to adequately develop the administrative record.  The Court

turns next to this issue.

### B.    Was Plaintiff Prejudiced by the Lack of Counsel?

---

[14]    Plaintiff cites to only one case for the proposition that "waiver of the right to representation is not valid unless there is a written waiver that acknowledges that the claimant understands his rights":  *Biswas v. Comm'r of Soc. Sec*., No. 05-3828, 2007 WL 580523, at *1 (3d Cir. Feb. 26, 2007).  (D.I. 17 at 5)  But *Biswas* does not stand for this principle.  Instead, that case was discussing Social Security regulations regarding a claimant's waiver of his right to an *administrative hearing.  Id.*; *see also Armond v. Soc. Sec. Admin*., CIVIL ACTION NUMBER 24-385, 2024 WL 5324365, at *8-9 (E.D. La. Dec. 5, 2024) (noting the same), *report and recommendation adopted*, 2025 WL 92353 (E.D. La. Jan. 14, 2025).

As the Court previously noted above, lack of counsel alone is not sufficient to justify remand; for remand to be warranted, the administrative hearing must be marked by prejudice or unfairness. *See Vivaritas*, 264 F. App'x at 158; *see also Hess*, 497 F.2d at 840 n.4. The ALJ has a duty to help *pro se* claimants develop the administrative record. *See Livingston*, 614 F.2d at 345; *see also Sims v. Apfel*, 530 U.S. 103, 111 (2000) ("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). In that regard, while the ALJ is not required to "search out all the relevant evidence which might be available," *Hess*, 497 F.2d at 840, he nevertheless "must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts[,]" *Reefer*, 326 F.3d at 380 (internal quotation marks and citation omitted); *see also Vivaritas*, 264 F. App'x at 157-58. This "heightened level of care and responsibility" owed to unrepresented claimants requires the ALJ to "assume a more active role" in development of the administrative record. *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979); *see Smith v. Harris*, 644 F.2d 985, 889 (3d Cir. 1981). "When an ALJ has failed to exercise his authority to attempt to fill significant evidentiary gaps that are material to the disability determination," then remand is appropriate. *Rosa v. Colvin*, 956 F. Supp. 2d 617, 622 (E.D. Pa. 2013) (internal quotation marks and citation omitted).

So how does Plaintiff attempt to meet his burden to show that the ALJ did not adequately develop the record here? Plaintiff makes three arguments in this regard. None are successful.

First, Plaintiff takes issue with the ALJ's decision to obtain interrogatory responses from Dr. Mani, rather than sending Plaintiff for an in-person, consultative examination. (D.I. 17 at 6-7) The decision on whether to order a consultative examination is within the sound discretion of the ALJ, unless the claimant establishes that such an examination was necessary to enable the ALJ to make the disability determination. *Thompson v. Halter*, 45 F. App'x 146, 149 (3d Cir.

2002).  And while an ALJ has a duty to resolve inconsistencies or insufficiencies in the evidence, he also has a variety of mechanisms that he can use to do so.  *See* 20 C.F.R. § 404.1519a(b); *Leandri v. O'Malley*, Civil No. 3:23-CV-00962, 2024 WL 3678375, at *2 (M.D. Pa. Aug. 6, 2024) ("[D]evelopment of the record and assessment of the medical opinion evidence rests soundly at the discretion of the ALJ."); *Byers v. Saul*, Case No. 3:19-cv-12247, 2021 WL 870819, at *6 (D.N.J. Mar. 9, 2021) (citing cases).  One acceptable method is for the ALJ to "seek . . . expert testimony through written interrogatories at any time in the hearing process." *Larkin v. O'Malley*, C.A. No. 23-275-LDH, 2024 WL 1675678, at *2 n.2 (D. Del. Mar. 28, 2024) (citing HALLEX I-2-5-42).

Here, as the Commissioner notes, the record included nearly 600 pages of medical records from Plaintiff's various treatment providers, and administrative medical findings from two state agency physicians and a consultative examiner.  (D.I. 22 at 8-9 (citing Tr. at 79-84, 86-91, 318-911))  The ALJ himself obtained certain of those records (including those from Plaintiff's most recent cardiac procedure); he further developed the evidence through his questioning at the two administrative hearings, and by seeking out Dr. Mani's opinions via interrogatory responses.  (*Id*. (citing Tr. at 48-63, 901-07))

Plaintiff has simply not met his burden to establish that the ALJ failed to adequately develop this record.  Indeed, Plaintiff never suggests why any conflicts or ambiguities in the record would have required an in-person cardiological examination, in order for the ALJ to make a valid disability determination.  (D.I. 17 at 7; D.I. 23 at 2); *Byers*, 2021 WL 870819, at *6 (concluding that the ALJ properly acted within her discretion when she did not order a consultative psychological examination, where the records otherwise included "sufficient [medical] evidence regarding Plaintiff's mental impairments to make a disability

determination[,]" and included evidence of a prior consultative examination and stage agency physician reviews); *see also Elizabeth B. v. Comm'r of Soc. Sec.*, Civil Action No. 20-12286 (RK), 2024 WL 1177185, at *4 (D.N.J. Mar. 18, 2024) (rejecting the claimant's argument that the ALJ did not sufficiently develop the record, where the claimant "fail[ed] to show how obtaining the records from her prior disability claim would offer any new evidence to bolster her claim of disability onset").

Second, Plaintiff asserts that the ALJ failed to proffer Dr. Mani's interrogatory responses to him before the ALJ issued his decision, and that this negated his due process right to examine, question, and object to evidence.  (D.I. 17 at 6-7)[15]

However, the record clearly indicates that the ALJ *did* proffer to Plaintiff all of the post-hearing evidence, *including* Dr. Mani's response to the ALJ's interrogatories.  On November 12, 2021, the ALJ sent a letter to Plaintiff describing certain new evidence that the ALJ proposed to enter into the record; this letter included copies of, *inter alia*, both the ALJ's request for medical interrogatories from Dr. Mani and Dr. Mani's responses thereto.[16]  (Tr. at 295-96 (noting that the

---

[15]    Procedural due process applies to proceedings before the SSA, such that claimants have certain rights with respect to evidence obtained after an administrative hearing.  *See Richardson v. Perales*, 402 U.S. 389, 401-02 (1971); *Wallace v. Bowen*, 869 F.2d 187, 191-92 (3d Cir. 1989).  When an ALJ intends to rely on evidence adduced outside the administrative hearing, "the ALJ must afford the claimant not only an opportunity to comment and present evidence but also an opportunity to cross-examine the authors of any post-hearing reports" at a supplemental hearing *if requested*.  *Wallace*, 869 F.2d at 193.  "Waiver of the right to subpoena and cross-examine witnesses concerning post-hearing evidence must be clearly expressed or strongly implied from the circumstances."  *Id*. (internal quotation marks and citation omitted).

[16]    At the close of the initial May 4 hearing, the ALJ had told Plaintiff that he was going to have Plaintiff's file reviewed by a doctor before making any final determination.  (Tr. at 64)  At the supplemental hearing, the ALJ again said that he would send Plaintiff's file to a cardiologist for review.  (*Id*. at 76)  There the ALJ explained to Plaintiff's wife that Plaintiff would receive a copy of the cardiologist's findings and that Plaintiff would receive "an opportunity to provide [the ALJ with] any additional comments or concerns."  (*Id*.)  When the

letter included Dr. Mani's responses as Exhibit 28F); *see also id*. at 902-07 (Dr. Mani's responses, which are marked as Exhibit 28F))  The ALJ's letter appears to have included all of the information that HALLEX I-2-7-30 recommends should be a part of such correspondence— including paragraphs making Plaintiff aware that he could request a further supplemental hearing, that he could subpoena a witness like Dr. Mani and that he could question such a witness at a hearing.  HALLEX I-2-7-30; (Tr. at 296; *see also* D.I. 17 at 6).  The letter also informed Plaintiff that if the ALJ did not receive a response from him within 10 days of Plaintiff's receipt of the documents, then the ALJ would assume Plaintiff did not intend to respond, and would go on to issue his decision.  (Tr. at 295-96)[17]  When Plaintiff did not respond, that is exactly what the ALJ did here.  Thus, the record demonstrates that the ALJ provided Plaintiff with adequate procedural due process regarding the use of Dr. Mani's opinions.  *See Killoran v. Comm'r of Soc. Sec.*, Civil Action No. 2:18-cv-00449, 2019 WL 3406430 (S.D. Ohio July 29, 2019) (rejecting the argument that the claimant's receipt of two letters of the type described above amounted to insufficient notice of the right to request a hearing in order to address newly-proffered medical evidence, and holding that the claimant's lack of response to those letters reasonably indicated the claimant's waiver of his right to seek such a hearing), *report and recommendation adopted,* 2019 WL 4854763 (S.D. Ohio Oct. 2,

---

ALJ asked if Plaintiff's wife had any questions about this, she responded that she did not.  (*Id*.)

[17]       The ALJ also submitted interrogatories to the vocational expert, Mr. Szollosy.  (*Id*. at 297-302, 304-08)  The record indicates that the ALJ sent both the request for interrogatories and Mr. Szollosy's response to Plaintiff on December 9, 2021, along with a letter similar to the November 12, 2021 letter.  (*Id*. at 309-10)  The November 12 and December 9, 2021 letters were two of a total of four proffer letters that the ALJ sent to Plaintiff from June through December 2021 (i.e., after the hearings and before issuance of the ALJ's decision).

2019); *see also Rei A v. Kijakazi*, CIVIL NO. 3:21cv849, 2022 WL 3909043, at *4 (N.D. Ind. Aug. 31, 2022); *Morris*, 2018 WL 395736, at *9-10.

Third, Plaintiff argues that the ALJ's use of interrogatories, including those obtained from Dr. Mani and from the vocational expert Mr. Szollosy, was too "complex" a procedure for an unrepresented claimant to understand. (D.I. 17 at 7)  He argues that the utilization of these interrogatories left him with no real way to figure out how to make his case before the ALJ.  (*See id.* ("As an unrepresented claimant, Mr. Colon would have had no idea what questions to ask or what objections to raise to the vocational and medical interrogatories.  The ALJ's use of complex interrogatory procedures prejudiced Mr. Colon, as an unrepresented claimant, by negating his right to examine, question, and object to evidence allegedly obtained on his behalf."); D.I. 23 at 2 ("[I]t is unlikely that an unrepresented claimant would have known how to proceed after receiving evidence obtained by the ALJ[.]"))

As an initial matter, although Plaintiff repeatedly calls the use of these interrogatories a "complex" procedure, he never really explains what he means in that regard.  Nor does he cite any case law in support of the proposition.  Why is the use of such interrogatories unduly "complex"?  Interrogatories are simply questions about Plaintiff's health and abilities—questions that that a physician or vocational expert has answered.  Those answers were provided to Plaintiff, along with instructions about how he could challenge the conclusions therein, if he had wanted to.  The Court does not understand why use of such a practice is so "complex" that it necessarily suggests prejudice here.

Moreover, although the ALJ has a duty "to assist the claimant in developing a full record," he does not have an "obligation to make a case for every claimant."  *Dietrich v. Saul*, 501 F. Supp. 3d 283, 293 (M.D. Pa. 2020) (internal quotation marks and citation omitted).

Plaintiff elected to proceed without representation.  To the extent that Plaintiff argues that an attorney would have been in a better position to make good use of these interrogatories than he was, that does not establish prejudice.  After all, if a claimant's ability to fare as well as a lawyer was a cause for remand, "then every *pro se* proceeding in which the applicant was less than fully successful would be in jeopardy." *Evangelista v. Sec'y of Health & Hum. Servs.*, 826 F.2d 136, 143 (1st Cir. 1987); *see also Smiley v. Comm'r of Soc. Sec.*, 7:16CV-1263 (WBC), 2018 WL 357295, at *5 (N.D.N.Y. Jan. 10, 2018) (finding an unrepresented claimant's "disadvantage[] because she did not have the benefit of an attorney to assist her with the post-hearing vocational expert interrogatories" did not equate to prejudice requiring remand).

Therefore, for the reasons set out above, Plaintiff was not prejudiced by his waiver of the right to representation or by his lack of counsel during proceedings before the SSA.  The ALJ fulfilled his duty to develop the record, such that remand is not justified on this ground.

### C.    Did the ALJ Fail to Consider Whether Plaintiff's Coronary Artery Disease Would Have Prevented Plaintiff from Working on a Regular and Sustained Basis During Any Continuous 12-Month Period?

Plaintiff's final argument is that the ALJ committed a legal error[18] in failing to consider whether Plaintiff's coronary artery disease rendered him disabled for any continuous 12-month period within the relevant timeframe.  (D.I. 17 at 7-9)  This assertion has to do with the

---

[18]    In his reply brief, Plaintiff emphasizes that he is *not* asserting here that the ALJ committed an error relating to the analysis of facts, or an error implicating the "substantial evidence" standard.  (D.I. 23 at 2)  Instead, he emphasized that the asserted error is a "legal" one: i.e., that the ALJ completely "fail[ed] to consider whether he was disabled for any continuous period of 12 months."  (*Id.* ("Mr. Colon has not asked this Court to make factual findings or re-weigh the evidence . . . .  To the contrary, Mr. Colon has asked this Court to find that the ALJ failed to make the required findings as to whether he was disabled for any continuous period of 12 months . . . .") (internal citations omitted))  The Court will thus only assess Plaintiff's assertion of legal error here.

definition of a "disability," which is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death *or which has lasted or can be expected to last for a continuous period of not less than 12 months*[.]"  42 U.S.C. § 423(d)(1)(A) (emphasis added).

Plaintiff's multi-step argument in this regard seems to go as follows:

> (1) In her interrogatory responses, Dr. Mani provided answers indicating that Plaintiff had no specific limitations from a cardiac standpoint—answers that supported the ALJ's ultimate determination that Plaintiff was not disabled, because he could perform his past relevant work and other jobs existing in significant numbers in the national economy.;
>
> (2) But Dr. Mani based her opinions *solely* on Exhibit 25 F, which is a *May 10, 2021* medical report—a report that states that Plaintiff had no specific cardiac limitations at the time (in light of the results of an April 2021 cardiac catheterization showing that Plaintiff had no obstructive coronary disease).;
>
> (3) Since Dr. Mani's (and the ALJ's) analysis was limited to the state of affairs as of this May 2021 record, this necessarily shows that the ALJ did *not* consider whether Plaintiff was disabled during *any prior* 12-month time period between March 11, 2018 and May 2021.; and
>
> (4) The failure to do so amounts to legal error.

(D.I. 17 at 8-9; D.I. 23 at 3)  The Court, however, disagrees with Plaintiff's argument for various reasons.

For one thing, the ALJ's opinion directly states that he did exactly what Plaintiff says he did not do.  At the opinion's outset, the ALJ notes that "[a]fter careful consideration of all of the evidence, the undersigned concludes the claimant *has not been under a disability within the meaning of the Social Security Act from March 11, 2018 through the date of this decision*."  (Tr. at 22 (emphasis added))

But beyond that introductory assertion, the remainder of the ALJ's decision shows that the ALJ did, in fact, consider Plaintiff's circumstances during the entire time period between March 2018 through May 2021.  For example, the ALJ described how Plaintiff was first treated for coronary artery disease in 2018 and how "in December 2018, he underwent percutaneous coronary intervention due to having symptoms of angina[.]"  (*Id*. at 25)  But when assessing Plaintiff's medical state in and after this 2018 time period, the ALJ noted that Plaintiff's "December 2018 left ventricular ejection was within the normal range of 55 to 60"; he also cited to medical records from December 2018 through July 2020 to support the proposition that Plaintiff "had mostly improved findings after the [December 2018] procedure[.]"  (*Id*. (citing Exhibit 7F at 21 (a December 2018 medical record); Exhibit 9F (medical records from various points in 2019); Exhibit 11F at 4 (a July 2020 medical record)))  The ALJ next referenced Plaintiff's July 2020 cardiac catheterization—but also cited to records noting that "since his July 2020 discharge, [Plaintiff's] angina improved with the claimant primarily having chest pain after eating."  (*Id*. (citing Exhibit 12F at 1-3))  Additionally, the ALJ referenced medical records from March 2020 through late 2021 to support his assessment that:  (1) Plaintiff thereafter "received some chest pain relief with sublingual nitroglycerin in the later months but had still been symptomatic"; (2) this led to the April 2021 finding of "no obstruction" in Plaintiff's heart; and (3) the overall record did not show significant deficits relating to chest pain.  (*Id*. (citing Exhibits 10F at 1, 4; Exhibit 12F; Exhibit 16F; Exhibit 17F; Exhibit 23F at 1; Exhibit 25F))  Lastly, the ALJ explained that he was not just relying on Dr. Mani's opinions, but also on the fact that those opinions were "consistent with the record" (dating from 2018 through 2021) that the ALJ had just summarized.  (*Id.* at 25-26)  The ALJ stated that this record demonstrated how "the claimant's chest pain has been noted to improve with medication or be primarily after eating[,]"

35

that Plaintiff had "no significant deficits with his placed stents[,]" that his April 2021 catheterization showed no obstruction and that he was following his medication regimen. (*Id.* (citations omitted))

In light of the above—including the ALJ's citation to plenty of supporting medical evidence dating from between March 2018 through May 2021—there can be no doubt that the ALJ *did*, in fact, consider Plaintiff's status over the entire relevant time period. Plaintiff's final argument about legal error, therefore, is a non-starter. *See Carl M. v. Kijakazi*, Case No. 1:21-cv-1124, 2022 WL 4549833, at *9 (D.N.J. Sept. 29, 2022) (rejecting a claimant's argument that the ALJ failed to consider whether he was disabled during every 12-month period in the relevant timeframe, where, *inter alia*, "the ALJ already explained through citation to the medical record why Plaintiff was not disabled during the relevant period"); *see also Ali v. Kijakazi*, Civil Action No. 1:22-CV-00780, 2024 WL 1157073, at *6 (D. Del. Mar. 18, 2024) (same).

## IV.    CONCLUSION

For the reasons set forth in this Report and Recommendation, the Court recommends that the District Court DENY Plaintiff's motion and GRANT Defendant's motion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.    .

Dated:  July 11, 2025

_Christopher J. Burke_
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE